[No. 1978.]

Louis Nash *v.* The State.

Burglary.— Forcible Entry in order to constitute burglary is not constituted alone by the entrance of the entire body. It is sufficient if only the hand is introduced into the house for the purpose of admitting the body with the ultimate intent of committing a felony. See the opinion and the statement of the case for evidence *held* sufficient to support a conviction for burglary.

Appeal from the District Court of Kaufman. Tried below before the Hon. Anson Rainey.

The conviction was for the burglary by force, with intent to commit theft, of the mill house of H. J. Snow and Frank Pude, in Kaufman county, Texas, on the 4th day of March, 1885. A term of two years in the penitentiary was the penalty assessed against the appellant. Dick Mathews and Alf Gantt were joined in the indictment, but appellant was alone upon trial.

Frank Pude was the first witness for the State. He testified that he was a member of the firm of Snow & Pude, which operated a gin and mill in the town of Kaufman, Kaufman county, Texas. On or about January 1, 1885, witness discovered that five sacks of flour had been taken from the mill through a trap-door. The trap-door was about two feet square in size, and was fastened to the mill floor by two hinges at one side, and was opened by being raised up from the inside. On or about March 4, 1885, witness set a gun with the trigger so attached to the trap-door that when it was raised it would discharge the gun. The gun was so placed that, being discharged, the charge would be propelled towards the trap-door. It was so arranged that it would not be discharged unless the trap-door was partially raised. It would have to be raised at least twelve and perhaps eighteen inches in order to discharge the gun. Witness placed a sack of flour partly on the trap-door, and left the mill late in the evening. He heard the report of a gun about bed-time that night, and when he went to the mill next morning he found that the gun he had set had been discharged. The trap-door was partially open, being so held by the sack of flour which he had placed on it. He found several tracks, a coat, a sack and a knife under the mill. He did not recognize the coat and sack, but recognized the knife as one which belonged to himself and Snow, and which was taken from the mill several months before. Witness showed the coat, sack and knife to Snow and others on the morning he found them. Witness

did not know how the parties got under the mill, and thought they crawled under through a hole made by the removal of a plank. The under part of the house and the engine room were raised from the ground, but the space was planked up. Parties, however, could find places through which they could get under the house and into the engine room without breaking. The witness found near the mill a square which was taken from a shop adjoining the mill on the same night. Witness gave no one his permission to enter the mill or gin house. Witness lived within three hundred yards of the mill house, and other persons lived about it. Chickens habitually roosted under the mill. Witness missed nothing from his mill on the morning after the gun was discharged, and did not think anybody got into the mill on the night before. The sack which the witness found under the mill was branded either H. T. M. or M. T. H.

H. J. Snow testified, for the State, that he and Pude were partners in the mill and gin business, but Pude had exclusive care, management and control of the mill, gin and premises. Witness knew nothing about the setting of the spring gun, as detailed by Pude. On the morning after the gun was said to have been discharged, Pude showed witness a coat, sack and knife which were said to have been found under the mill. Witness recognized the coat as the property of defendant. He did not recognize the sack.

Alf Gantt testified, for the State, that he lived about one mile from Kaufman. Early in March, 1885, witness, Dick Mathews and defendant went to town for the avowed purpose of getting some chickens. On the way Mathews said that if they went to the mill he was going into the mill and get some flour. The defendant replied that he would have nothing to do with going into the mill or taking flour, and that he wanted nothing but chickens. The witness, defendant and Mathews went to the mill, and all crawled under it in quest of chickens. While under the mill Mathews called witness's attention to a trap-door in the floor of the mill, and told witness to raise it. Witness undertook to raise it, when a gun was discharged, and witness, defendant and Mathews ran off. The three parties agreed to go into the mill and get flour before they got to it. Before the trap gun was sprung Mathews went into a shop near the mill and got a square. Defendant was somewhere near the trap-door when the gun was discharged.

Cross-examined, the witness said that he, defendant and Mathews started to town to get chickens and not to break into the mill. When, on the way, Mathews proposed to go into the mill, defend-

ant objected, and, witness thinks, objected a second time when Mathews told witness to raise the trap-door. Witness, defendant and Mathews went into and got flour from the mill in January, 1885, but did not go into the mill on the night charged in the indictment. The State closed.

H. T. Nash testified, for the defense, that his father raised the defendant, and that he had known the defendant all his life. His reputation for honesty, until charged with this offense, had been good. Defendant at first denied to witness that he knew anything about the attempted burglary of the mill, but the witness pressed him, telling him he wanted to know the truth about it, and defendant confessed that he was present when the gun was discharged. He said that he, Mathews and Gantt came to town together, but had no understanding to break into the mill or to take flour; that they went only to get some chickens; that something was said *en route* about going into the mill and getting flour, but he told the other two parties promptly that he would have nothing to do with such an enterprise; that he went under the mill in quest of chickens; that one of the others went into a neighboring shop and got a square, which he, defendant, told him not to take; that one of the others then proposed to enter the mill and get some flour, and that he attempted to dissuade the others, and said again that he would have nothing to do with going into the mill, and that in fact he had nothing to do with the attempt to get in.

H. T. Moore testified, for the defense, that he had known the defendant about twelve years, and had had him in his employ. Defendant's reputation for honesty had been good. Witness thought he could explain the peculiarity about the sack found at the mill. "I suppose the defendant, when he lived with me, saw my sacks branded H. T. M., and, in order to distinguish his own sacks since, may have branded them with my brand transposed, thus, M. T. H."

The motion for new trial raised the questions discussed in the opinion.

*H. P. Teague*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

Hurt, Judge. This is a conviction for burglary, by entering a mill house with intent to commit theft.

The only question presented deemed worthy of discussion is

whether the proof shows a burglarious entry, or rather was there in law an entry at all?

From the evidence it appears that there was a trap-door in the floor, which opened upward on hinges. The proprietor of the mill, because of prior depredations of like character, suspected other burglarious attempts, and, to prevent their success, placed over the trap-door "a spring gun." In order to fire this gun the door would have to be raised about twelve inches. On the night of the attempted burglary and theft, one of the party of would-be burglars placed his hand under the door and raised it, and, while pushing the door upward, the gun fired. Next morning the door was partly open, being held in this position by a sack of flour which had been placed on it, and which had evidently caught under the edge of the door when the gun fired, and it fell back.

As before suggested, did this act constitute an entry within the meaning of the statute? "An entry is not confined to the entrance of the whole body; it may consist of the entry of any part, for the purpose of committing a felony."

When the door was raised, say twelve inches, the hand that raised the door was in the house, and by virtue of the above excerpt from the statute, we think the entry was complete. This view is most evidently sustained by the opinion in *Franco* v. *The State*, 42 Texas, 276. In that case the hand was introduced for the purpose of effecting an entrance by the whole body, for the purpose of raising the window — a breaking at law, through which the party might in fact enter. The primary intent being a breaking by raising the window, the ultimate intent being a felony, the court held such entry complete and burglarious.

The judgment is affirmed.

*Affirmed.*

[Opinion delivered February 24, 1886.]